# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SUSAN MLADUCKY,

      Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

No. 13 C 5324

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Susan Mladucky filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d

973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Mladucky protectively filed for DIB on October 26, 2010, alleging that she became disabled on October 4, 2010, because of depression and knee problems. (R. at 17, 151, 162). Defendant denied Maladucky's application initially and on reconsideration, after which Mladucky filed a timely request for a hearing. (*Id.* at 17, 74–80, 86–89, 91–92). On March 9, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 17, 36–73). The ALJ also heard testimony from James J. Radke, a vocational expert (VE). (*Id.* at 17, 36–73, 121–22).[2]

The ALJ denied Plaintiff's request for benefits on April 25, 2012. (R. at 17–31). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since October 4, 2010, the alleged onset date. (*Id.* at 19). At step two, the ALJ found that Plaintiff's knee arthritis constitutes a severe impairment, but found Plaintiff's mental impairments of depression and anxiety nonsevere. (*Id.* at 19–20). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 21).

---

[2] The hearing transcript mistakenly refers to the VE as Jill Radke. (*Compare* R. at 36, 37, 58 *with id.* at 17, 121).

The ALJ then assessed Mladucky's residual functional capacity (RFC)[3] and determined that she has the RFC to perform less than the full range of light work, as defined in 20 C.F.R. § 404.1567(b):

> [Plaintiff] can lift and/or carry no more than 20 pounds occasionally and up to 10 pounds frequently, can stand and/or walk approximately 6 hours in an 8-hour workday. [Plaintiff] requires a sit/stand option that would permit her to sit intermittently for approximately 2 hours in an 8-hour workday. [Plaintiff] cannot climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; and can occasionally balance, stoop, kneel, crouch and crawl.

(R. at 21–22). At step four, the ALJ determined that Plaintiff is capable of performing her past relevant work as a retail manager as generally performed in the economy. (*Id*. at 30–31).

The Appeals Council denied Mladucky's request for review on June 7, 2013. (R. at 1–6). Mladucky now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. MEDICAL EVIDENCE

Mladucky was born on September 5, 1951, and was 59 years old when she filed for DIB. (R. at 131, 151). Mladucky's disability purportedly results from mental and physical impairments including major depressive disorder with anxiety features and osteoarthritis in her knees connected to the total knee replacement of her left knee in 2006 and her right knee in 2007. (*Id*. at 162, 226).

The medical records indicate that Mladucky began treatment for depression with her primary care physician, Michele F. Carlon, M.D., on May 21, 2009. (R. at 283, 286; *see also id*. at 273). A day after Mladucky left work, on October 5, 2010, she saw Dr. Carlon and complained that she cried all the time and felt hopeless, helpless and worthless. (*Id*. at 304, 310, 311). Dr. Carlon noted Mladucky's clinical depression diagnosis and prescribed 150mg Wellbutrin XL[4] and referred her to therapy with Melanie Weller, L.C.S.W. (*Id*. at 304). On October 12, 2010, Mladucky complained of continued feelings of hopelessness and helplessness as well as difficulty concentrating and sleeping. (*Id*. at 302). Dr. Carlon then diagnosed Mladucky with severe depression, increased her prescription to 300mg Wellbutrin XL and 1mg Clonazepam,[5] and referred her to a psychiatrist. (*Id*.).

Mladucky began psychiatric treatment with John Lim, M.D., on October 21, 2010. (R. at 274). Mladucky reported that she felt sick at work and was unable to return to work due to feeling sick every time she tried. (*Id*. at 273). Mladucky com-

---

[4] Wellbutrin XL (bupropion) is an antidepressant. <www.drugs.com>

[5] Clonazepam is "used to relieve panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)." <http://www.nlm.nih.gov/medlineplus/druginfo/>

plained that over the last year, she cried all the time and had decreased concentration, poor sleep and increased anxiety. (*Id.*). Dr. Lim diagnosed Mladucky with major depressive disorder with anxiety features and proscribed 300mg Wellbutrin XL, 45mg mirtazapine, and 20mg Lexapro, along with Clonazepam as needed.[6] (*Id.* at 274, 298). On November 18, 2010, Mladucky reported that not working had helped her anxiety, and she reported that she had met with her therapist, Melanie Weller. (*Id.* at 272; *see also id.* at 273).

On October 29, 2010, Dr. Carlon examined Mladucky's osteoarthritis in her knees. (R. at 298). Mladucky complained that during the time she was working, she could not get up out of her car or climb stairs because of her pain. (*Id.* at 262, 298). Even though she was no longer working, Mladucky had difficulty getting on and off the examining table and getting up and off the chair. (*Id.* at 298). Dr. Carlon concluded that Mladucky's work caused knee pain and that because she was off work, she no longer felt knee pain. (*Id.*; *see also id.* at 297).

On December 16, 2010, Dr. Carlon examined Mladucky and filled out a DDS Psychiatric Report, a DDS Arthritic Report and a U.S. Department of Labor Certification Health Care Provider for Employee's Serious Health Condition form. (R. at 222–25, 226–28, 296, 322–25). Dr. Carlon observed crepitus[7] in Mladucky's knees

---

[6] Mirtazapine and Lexapro are antidepressants used to treat major depressive disorders. <www.drugs.com>

[7] Crepitus "describe[s] the grating, cracking or popping sounds and sensations experienced under the skin and joints or a crackling sensation due to the presence of air in the subcutaneous tissue…the sound can be created … in osteoarthritis … when the cartilage around joints has eroded away and the surfaces in the joint start to grind against one an-

with flexion and extension and found that Mladucky had constant knee pain while working, requiring nonsteroidal anti-inflammatory drugs (NSAIDs) daily. (*Id.* at 225–26, 296). Dr. Carlon concluded that Mladucky "really needs a sedentary job." (*Id.* at 296; *see also id.* at 228, 324). Dr. Carlon noted Mladucky's depression was improving though she described Mladucky's mood and affect as flat and depressed and advised her to continue psychiatric treatment with Dr. Lim and with her therapist. (*Id.* at 223, 296).

Mladucky met with Dr. Lim on December 23, 2010, January 24, 2011, and February 14, 2011. (R. at 268–70). He noted that Mladucky felt calmer and less anxious. (*Id.*). Dr. Lim concluded that physical proximity to her workplace and talking about her work and her boss caused Mladucky to feel anxiety, shaky and sick. (*Id.* at 268–70). Dr. Lim continued Wellbutrin XL and Buspirone.[8] (*Id.*).

On February 1, 2011, Henry Fine, M.D., conducted a consultative psychiatric examination on behalf of the Commissioner. (R. at 241). Mladucky complained of low mood, low energy, and crying for minor reasons. (*Id.*). Dr. Fine described Mladucky's mood as depressed, found that Mladucky presented with major depression syndromes for the past 1½ years, and also diagnosed a slight, immediate memory deficit. (*Id.* at 244). Dr. Fine concluded that it was uncertain whether Plaintiff's work

---

other, or when the fracture surfaces of two broken bones rub together." <http://en.wikipedia.org/wiki/Crepitus>

   [8] "Buspirone is used to treat symptoms of anxiety, such as fear, tension, irritability, dizziness, pounding heartbeat, and other physical symptoms." <www.drugs.com>

situation and stress precipitated the depression or whether the depression precipitated the problems at work. (*Id*.).

On February 21, 2011, Calixto Aquino, M.D., a DDS nonexamining physician, conducted a medical evaluation. (R. at 259–61). Dr. Aquino concluded that Mladucky's osteoarthritis was nonsevere because she reported that her constant knee pain was gone and that she felt better. (*Id*. at 261). On May 31, 2011, Charles Wabner, M.D., another DDS nonexamining physician, affirmed Dr. Aquino's assessment, noting that Mladucky presented no new allegations and the treatment notes did not show any worsening of her condition. (*Id*. at 279–281).

On February 21, 2011, Michael J. Schneider, Ph.D., a nonexamining DDS medical consultant completed a Psychiatric Review Technique form. (R. at 245–56). Dr. Schneider reviewed the activities of daily living (ADL) information submitted by Mladucky and her husband, who both described panic attacks triggered by her job, poor concentration, and poor memory. (*Id*. at 257). Dr. Schneider found the ADL credible in light of the objective medical evidence. (*Id*.). Dr. Schneider reviewed Dr. Lim's and Dr. Fine's opinions and concluded that Dr. Lim's opinion, finding that Mladucky could not work given that her depression limited her concentration, should be accorded little weight because of Dr. Fine's contrary opinion that Mladucky could concentrate on many tasks sufficient for simple work. (*Id*.). In sum, Dr. Schneider opined that Mladucky's mental impairment did not present any severe functional limitations. (*Id*.).

On March 10, 2011, Dr. Carlon found tenderness in the anserine bursae[9] of both knees, marked crepitus with flexion and extension and mild swelling around the patellae[10] bilaterally. (R. at 290; *see also id.* at 291). Dr. Carlon noted that Mladucky suffered bilateral knee pain if she stood on her feet for more than 15–20 minutes on cement floor at work and concluded that Mladucky could not remain standing for more than 15 minutes at a time. (*Id.* at 262, 311). Dr. Carlon further concluded that Mladucky must be able to sit and stand at will and could not lift more than 10 pounds. (*Id.* at 311).

At the hearing, Mladucky testified that she can no longer perform her job due to her knee pain and that she cannot walk or remain standing for more than 20 minutes. (R. at 45–46). She can perform light activities around the house (such as dusting or preparing simple microwave meals) but needs to sit down after 20 minutes of such activity. (*Id.* at 49). She can navigate the steps to her second floor apartment with difficulty, but needs her children's assistance to carry any heavy items up the steps. (*Id.* at 50). She must occasionally elevate and ice her knees when swollen or in pain, but does not receive medication or physical therapy for her knees. (*Id.* at 45–46, 48–49). She testified that at work, where she stood for eight

---

[9] Anserine bursa is a sub muscular bursa in the inner knee. <http://en.wikipedia.org/wiki/Pes_anserine_bursitis> A bursa is a "small fluid-filled sac [that] provides a cushion between bones and tendons and/or muscles around a joint." <http://en.wikipedia.org/wiki/Synovial_bursa>

[10] "The patella, also known as the kneecap or kneepan, is a thick, circular-triangular bone which articulates with the femur (thigh bone) and covers and protects the anterior articular surface of the knee joint." <http://en.wikipedia.org/wiki/Patella>

hours, she experienced 8–9/10 on the pain scale, but now does not feel the same degree of pain since she is not working. (*Id.* at 55–56).

Regarding her depression and anxiety, Mladucky testified that she experiences panic attacks when she returns to the pharmacy where she previously worked to pick up medication, and she feels nervous and anxious thinking about being around the public at work. (R. at 48, 56). She also testified that she has difficulty focusing and concentrating given that her mind wanders. (*Id.* at 56–57). She was able to get off some of the medication prescribed by her psychiatrist, but continues to take Wellbutrin. (*Id.* at 48). Mladucky's social activities include occasionally playing bingo in the neighborhood and receiving visits from her daughter and grandchildren, but she mostly lies on the couch watching television during the day. (*Id.* at 52, 54–55).

## V. DISCUSSION

Plaintiff raises three arguments in support of her request to reverse and remand: (A) the ALJ improperly weighed Dr. Carlon's and Dr. Lim's opinions; (B) the ALJ improperly assessed Mladucky's RFC; and (C) the ALJ erred in assessing Plaintiff's credibility. (Mot. 9–21; Reply 1–16). Plaintiff contends that Dr. Carlon's and Dr. Lim's opinions were supported by the medical evidence and should have been afforded significant weight. (Mot. 9–13; Reply 1–7). Plaintiff argues that the ALJ's decision did not assess the requisite checklist of factors and lacked substantial support in finding inconsistency between the treatment record and Mladucky's functional capacity. (Mot. 10–13; Reply 2, 5).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

## A. Dr. Carlon's Opinions of Mladucky's Physical Impairment

In his decision, the ALJ acknowledged Mladucky as Dr. Carlon's "long-time pa-

tient," but declined to give controlling weight to Dr. Carlon's opinions:

> Dr. Carlon's opinions are not credible and out of proportion to [Plain-
> tiff's] treatment record and the objective medical evidence of record. I
> also note that her opinion is inconsistent and contradictory. In this re-
> gard, I note that the records are replete with references to [Plaintiff]
> being "pain free" since being off work, yet Dr. Carlon noted that [Plain-
> tiff] had pain rated as a "4" on a scale of "1 to 10." In support of this, I
> note that [Plaintiff] does not even take pain medications for knee pain.
> Dr. Carlon's treatment notes do not support a "disabled" opinion. The
> Fitness for Duty Certificate suggests that [Plaintiff] could go back to
> work part-time. Dr. Carlon's findings from March 2011 noted only
> scars on the knees bilaterally from previous surgery and swelling if
> and when [Plaintiff] was on her knees. Given the extremely limited
> treatment record and the nature of these opinions, this appears to be
> the case of a doctor who is attempting to assist a long-time patient
> with getting various types of work-related benefits, and as such, I give
> very little weight to her opinions.
>
> . . . I give no weight to the opinions of Dr. Carlon in [the] disability
> statements for a private insurance carrier. To the extent that . . . an-
> other agency found that [Plaintiff] was disabled . . . , such a determina-
> tion is not binding on Social Security. Further, any opinion expressed
> is quite conclusory, provides very little explanation of the evidence re-
> lied on in forming that opinion or the basis for the opinions. Similarly,
> the "Fitness for Duty" statements from Dr. Carlon and Dr. Lim are
> given little weight as they are not consistent with the longitudinal rec-
> ord and also suggest that [Plaintiff] could go back to part-time work.

(R. at 29–30) (citations omitted).

Under the circumstances, the ALJ's decision to give Dr. Carlon's opinions "very

little weight" or "no weight" is legally insufficient and is not supported by substan-

tial evidence. First, the medical evidence supports Dr. Carlon's conclusion that Mla-

ducky must have a sedentary job and cannot stand for more than 15 minutes at a

time. (R. at 228, 262, 292, 311). Dr. Carlon's clinical findings, including marked

crepitus in Mladucky's knees upon flexion and extension, tenderness in the anserine bursae, and knee swelling, support her diagnosis of knee osteoarthritis. (*Id*. at 290–91, 296–97). Dr. Carlon also observed Mladucky's difficulty getting on and off the examining table and getting up and off the chair. (*Id*. at 298). Dr. Carlon further noted Mladucky's complaints of knee pain of 7–8/10 on the pain scale while working, resulting in her inability to get out of her car after work. (*Id*. at 298). Dr. Carlon concluded that work caused Mladucky's knee pain and noted that at her workplace, Mladucky stood for eight hours a day without the ability to sit at the register. (*Id*. at 233, 290). Thus, Dr. Carlon opined that Mladucky could work part-time if she could sit and stand at will, if she did not stand for more than 15 minutes or lift over 10 pounds, and if she were allowed to sit at the register. (*Id*. at 311).

Second, Dr. Carlon's opinions were not based solely on Plaintiff's self-reports. If a "physician's opinion is . . . based solely on the patient's subjective complaints, the ALJ may discount it." Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added). Dr. Carlon's opinion that Plaintiff needed a sedentary job because of knee pain is not a mere recitation of Plaintiff's self-report but was also based on her observation of Plaintiff's difficulty in moving from the examining table and chair as well as the crepitus and swelling of Plaintiff's knees. (See R. at 290–91, 296–98). Plaintiff's self-report was necessarily factored into Dr. Carlon's analysis as almost all diagnoses require some consideration of the claimant's subjective symptoms. *See Flores v. Massanari*, 19 F. App'x 393, 402–03 (7th Cir. 2001) ("Any medical diagnosis necessarily must rely upon a patient's history and subjective complaints."). The

ALJ failed to identify any evidence in the record to suggest that Dr. Carlon had reason to disbelieve Plaintiff's self-report, or that Dr. Carlon relied unnecessarily on Plaintiff's description of her symptoms rather than her own observations, in concluding that Plaintiff required sedentary work. (*See* R. at 30); s*ee also Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [the claimant's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations.").

Third, Dr. Carlon's treatment notes regarding Mladucky's knee pain are consistent with the longitudinal record. Contrary to the ALJ's conclusion, the records stating that Mladucky was "pain free" yet experienced 4/10 on the pain scale are consistent. Dr. Carlon's descriptions of Mladucky's pain specifically referred to her "constant pain" while at work, and Dr. Carlon's "pain free" assertions referred to Mladucky's pain disappearing since the time she stopped working. (*See, e.g.*, R. at 232 ("can't kneel or lift but *constant* pain is gone"), 233 (Working caused Mladucky's knee pain, and she experienced 7–8/10 on the pain scale, but since not working, she experiences 1–2/10 on the pain scale. Her pain is "not *constant* anymore" and [Mladucky] is "pain free now not working."), 234 ("[Mladucky] was in *constant* pain while

working, [but] now for the [first] time since [the knee] replacements[,] she's [almost] pain free."), 323 ("Since off work, her chronic *constant* knee pain is gone.") (emphasis added); s*ee also id.* at 56 (Plaintiff testifying, "I have pain . . . you know [my knees] hurt. But it's not like when I was standing")). While Mladucky no longer experienced constant pain, certain movements, including climbing stairs, getting up out of chairs and walking, triggered pain of 4/10 on the pain scale, but since not working, she has avoided activities that triggered her pain. (*Id*. at 262).

The fact that Mladucky no longer requires pain medication for her knees is consistent with the longitudinal record. (*See* R. at 29). Mladucky's pain and need for medication progressively subsided once she stopped work. While working, Dr. Carlon noted that Mladucky took pain medication on a daily basis. (*Id*. at 296, 225–26). After she stopped working, Mladucky only occasionally took pain medication. (*See, e.g.*, R. at 238 ("occas[ional] Tylenol helps [with] pain [for right knee]"), 291 ("takes Aleve and it helps . . . not on it like she was.")). At the time of the hearing, approximately 17 months after she stopped working, Mladucky testified that she no longer took medication for her knees, but that she still applied ice and a heating pad to her right knee every two weeks. (*Id*. at 48–49). Thus, the fact that Mladucky no longer took pain medication at the time of the hearing is entirely consistent with her decreased need for pain medication since being off work.

Dr. Carlon's opinion that Mladucky could work part-time does not conflict with a disability determination. The ability to work part-time does not necessarily translate to fulltime work, which is the basis for RFC assessment. Social Security Ruling

(SSR)[11] 96-8p, at *1; *see Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time."). Thus, Dr. Carlon's opinion that Mladucky could work part-time does not undermine Mladucky's DIB claim, which is based on whether she could perform fulltime work. Further, the ALJ fails to cite the medical evidence in the longitudinal record that he views inconsistent with the opinion that Mladucky could work part-time. (R. at 30).

Fourth, the ALJ may not accord "no weight" to the opinions Dr. Carlon prepared for private insurance carriers. (*See* R. at 262–65, 283–88). Although disability determinations by other agencies are not binding for purposes of Social Security, the "ALJ must consider all medical opinions in the record." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); s*ee* 20 C.F.R. §§ 404.1527(b)–(c), 404.1512(b), 416.912(b). Even if reports provide an opinion regarding Plaintiff's ability to work, which is a determination reserved to the Commissioner, "that does not mean that the ALJ should [ignore] th[e] statement." *Roddy*, 705 F.3d at 638; *see also Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013) ("Whether the applicant is sufficiently disabled to qualify for social security disability benefits is a question of law that can't be answered by a physician. But the answer to the question depends on the applicant's

---

[11] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored."); s*ee also* SSR 06-03p ("[The] decisions [of disability by other agencies], *and the evidence used to make these decisions*, may provide insight into the individual's mental and physical impairment(s)") (emphasis added). Here, the insurance reports signed by Dr. Carlon included her recommendations as to Plaintiff's ability to work but also contained information regarding patient symptoms, clinical findings and treatment plans that are relevant to Plaintiff's mental and physical impairments. (*Id*. at 262–65, 283–88). Therefore, the ALJ should have considered the medical evidence contained in those reports.

Finally, if an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527. In this case, the ALJ did not address the checklist of factors. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). Many of the factors support the conclusion that Dr. Carlon's opinion should be given great weight: she treated Mladucky for over 20 years, she met with Mladucky 10

times over the course of six months, her findings were supported by diagnostic observations and her findings were consistent with the medical evidence. (R. at 57–58, 289–304, 328). "Proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Carlon's] opinion." *Campbell*, 627 F.3d at 308. On remand, if the ALJ has any questions about whether to give controlling weight to Dr. Carlon's opinion, he is encouraged to recontact her, order an updated consultative examination, or seek the assistance of a medical expert. *See* SSR 96-5p, at *2; 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted).

## B. Dr. Lim's Opinion of Mladucky's Mental Impairment

The ALJ made only one reference to the weight he accorded to Dr. Lim's opinion, giving "little weight" to Dr. Lim's "Fitness for Duty" statement because "it [was] not consistent with the longitudinal record" and "[suggested] that [Mladucky] could go back to part-time work." (R. at 30). After careful examination of the record, the Court finds that the ALJ's decision to give Dr. Lim's opinion "little weight" is legally insufficient and not supported by substantial evidence. First, as discussed above, Dr. Lim's opinion that Mladucky could work part-time does not preclude her DIB claim and the ALJ did not identify any contradictory evidence in finding the "Fit-

ness for Duty" statement inconsistent with the longitudinal record. (*Id.* at 30; *see id.* at 310).

The Commissioner argues that Dr. Lim's July 2011 treatment note, indicating that Mladucky could "work from a psych point of view if [her employer would] meet her medical accommodations," supports the ALJ's opinion that Mladucky's mental impairment had resolved and does not warrant a part-time limitation. (Resp. 5; R. at 320). The Court, however, must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("the government's brief and oral argument . . . seem determined to dissolve the *Chenery* doctrine in an acid of harmless error"). Here, the ALJ did not point to any particular treatment notes that he would find inconsistent with an opinion that Mladucky was restricted to part-time work. In addition, the treatment note does not specify whether Dr. Lim found Mladucky capable of returning to fulltime work. (R. at 320).

Second, the ALJ's reasons for giving "great weight" to the opinions of the state agency medical consultants, including Dr. Schneider, are inconsistent with the record. (R. at 30). Dr. Schneider inaccurately represented the findings from Dr. Fine's consultative psychiatric examination in stating that Plaintiff's anxiety was situational to the pressure at her recent position and poor relationship with her boss. (*Id.* at 257). Dr. Fine's report concluded that it was uncertain whether the work situation and stress precipitated the depression or whether the depression precipitated the problems at work. (*Id.* at 244). Therefore, contrary to the ALJ's conclusion, the

record does not conclusively show that Plaintiff's mental problems were specific to her former workplace and relationship with her boss. (R. at 26, 29, 30; *see id.* at 56 (Plaintiff testifying, "I get nervous when I'm with people . . . in public.")). The ALJ cannot discuss only those portions of the record that support his opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports … but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

Third, Dr. Lim's opinion is supported by the medical evidence, and thus, the ALJ erred in not giving great weight to Dr. Lim opinion. In October 2010, Dr. Lim noted Mladucky's symptoms including incessant crying, decreased concentration, poor sleep and increased anxiety, and he diagnosed her with major depressive disorder with anxiety features. (*Id.* at 273–74). Dr. Lim noted that Mladucky's depression improved with medication, but that speaking about her work or coming in close proximity of her work caused her to feel anxiety, shaky and sick. (R. at 266–70). Given that Mladucky's work triggered anxiety, Dr. Lim recommended medical leave on three occasions. (*Id.* at 306–07, 309). On March 10, 2011, Dr. Lim opined that Mladucky could resume part-time work of 20 hours per week with a scheduled follow up appointment after four weeks. (*Id.* at 310). In July 2011, Dr. Lim noted that Mladucky's employer could not accommodate her need to sit as recommended by Dr. Carlon, but that if this medical accommodation were met, she could work from a

psychological point of view; however, he also notes Mladucky's comment that she was calmer as along as she did not work at her former job. (*Id*. at 320). At the time of the hearing, Mladucky testified to continued psychiatric treatment, including use of Wellsburin. (*Id*. at 48, 56). Significantly, Dr. Carlon concurred with Dr. Lim, noting Mladucky's symptoms ("crying, fatigue, anxiety" and "severe depression, crying all the time, severe stress concerning her job, feels she's being harassed") and clinical findings ("tearfulness, flat affect, feels hopeless, helpless, can't concentrate") in support of a diagnosis of major severe depression. (*Id*. at 262, 283, 286, 302–04).

Finally, the ALJ did not explicitly address the checklist of factors as applied to the medical opinion evidence of Dr. Lim. Many of the factors support the conclusion that Dr. Lim's opinion should be given great weight: he is a psychiatrist who treated Mladucky on an approximately monthly basis for at least one year, his findings were supported by diagnostic observations and his findings were consistent with the medical evidence. (R. at 266–74, 319–20) "Proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Lim's] opinion." *Campbell*, 627 F.3d at 308.[12]

## A. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing

---

[12] Because the Court is remanding the ALJ's decision to give the treating physicians' opinions little or no weight, the Court will not address Plaintiff's arguments regarding the ALJ's credibility determination.

meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Carlon's and Dr. Lim's opinions, explicitly addressing the required checklist of factors. The ALJ shall also reassess Mladucky's credibility with due regard for the full range of medical evidence; the ALJ shall then reevaluate Mladucky's physical and mental impairments and RFC, considering all of the evidence of record, including Mladucky's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings

## V. CONCLUSION

For the reasons stated above, Mladucky's request to reverse the ALJ's decision and remand for additional proceedings is **GRANTED**. Defendant's Motion for Summary Judgment [24] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: July 21, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge